Case 1:24-cv-07021 Document 1 Filed 09/17/24 Page 1 of 28

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

GURPATWANT SINGH PANNUN,

*Plaintiff*,

v.

THE GOVERNMENT OF INDIA, AJIT DOVAL, SAMANT GOEL, VIKRAM YADAV, NIKHIL GUPTA, and DOES 1-50,

*Defendants*.

Case No: 1:24-cv-7021

**COMPLAINT**

Plaintiff Gurpatwant Singh Pannun alleges against Defendants the Government of India Ajit Doval, Samat Goel, Vikram Yadav, Nikhil Gupta, as follows:

**INTRODUCTION**

1. Plaintiff Gurpatwant Singh Pannun is a New York attorney of Sikh heritage who leads a human rights organization called "Sikhs for Justice" ("SFJ") that advocates for the rights of Sikhs and other persecuted Indian minorities and has criticized the human rights abuses by successive Indian regimes including that of current Prime Minister, Narendra Modi. Unable to silence Mr. Pannun's speech through intimidation, Modi's Government engaged Defendant Gupta to hire an assassin in New York to murder him. At the same time, the Government of India hired hitmen in Vancouver to assassinate Mr. Pannun's colleague and fellow human rights activist, a Canadian of Sikh heritage, Hardeep Singh Nijjar. These efforts were overseen by Defendant Yadav (a Senior Intelligence Officer in India's Research and Analysis Wing ("RAW")) and approved by Defendant Goel (the Chief of RAW) and Defendant Doval (the National Security Advisor), both of whom reported directly to Modi. RAW's assassins killed Mr. Nijjar in Canada on June 18, 2023, but the scheme to murder Mr. Pannun unraveled when the hitmen India tried to hire turned out to be undercover U.S. law enforcement agents. The U.S. captured and indicted Gupta. But the Government of India denies responsibility. Mr. Pannun brings this action to hold the Government of India, Doval, Goel, Yadav, and Gupta, accountable for their unprecedented attempt to assassinate a U.S. citizen on U.S. soil.[1]

2. Defendants' efforts to kill Mr. Pannun are part of a broader policy by successive Indian governments to violently suppress dissent that has resulted in the June 1984 Indian

[1] Mr. Pannun at this time has not named Modi as a defendant due to his immunity as head of a foreign sovereign. Mr. Pannun reserves his right to amend the complaint to include Modi as a defendant should Modi's status change during the course of these proceedings.

Case 1:24-cv-07017-KPF Document 1 Filed 09/17/24 Page 3 of 28

military's attack and massacre of pilgrims at the holiest Sikh Shrine—the Golden Temple of Amritsar—the 'Sikh Genocide' in November 1984, arbitrary detentions, torture, enforced disappearances, and extrajudicial executions of Sikhs, misuse and manipulation of the criminal justice system, use of colonial era "sedition laws," use of the draconian "Unlawful Activities Prevention Act" (UAPA), and issuing INTERPOL Red Notices based on trumped-up charges, including against Mr. Pannun. In 2020, Modi's government "outlawed" SJF for, among other things, "propagat[ing] anti-national and separatist sentiments." Nine United Nations Special Rapporteurs raised concerns about India's misuse of its laws "in the context of ongoing discrimination directed against religious and other minorities, human rights defenders, and political dissidents, against whom the law has been used." Regularly, supporters of SFJ and campaigners for the Khalistan Referendum are arbitrarily detained, falsely charged and prosecuted, tortured, and denied due process for the charges they face.

3. In an attempt to allay international concerns about its extraterritorial assassination attempt, the Government of India purported to investigate the plot to murder Mr. Pannun. It concluded that a "rogue operative" was solely responsible. But this investigation was a sham. A recent Washington Post investigation revealed that the assassination plot was implemented by Yadav while working at RAW and "directed from within the Indian spy service." According to the Post, Western security officials have implicated in the plot "[h]igher-ranking RAW officials" who have "potential links to Modi's inner circle." The assassination is also consistent with RAW's broader policy of extraterritorial assassinations—India has been traced to over 20 recent international murders carried out by RAW.

4. At the same time as decrying claims that the Government of India orchestrated this plot as "absurd," Modi has bragged about India's ability to target dissenters. At a rally in

April 2024, Modi boasted that "even India's enemies know this is Modi, this is the new India," and that "this new India can come into your house and kill you"—a claim he repeated on July 2, 2024, in a speech to the Indian Parliament. Because Modi's government was willing to violate U.S. sovereignty to try to assassinate Mr. Pannun, has tried to hide the truth about what happened, and has given no indication that his government has stopped actively plotting extrajudicial killings or attacking, torturing, and imprisoning Mr. Pannun's colleagues, Mr. Pannun faces a continued threat to his life from the Government of India and its agents.

5. Defendants should be required to compensate Mr. Pannun for the harm they caused and are continuing to cause him and explain their role in the assassination plot.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over the claims against Doval, Goel, Yadav, and Gupta pursuant to 28 U.S.C. § 1332(a) because the parties have complete diversity and because the amount in controversy exceeds $75,000. Mr. Pannun is a citizen of the United States and Canada and a resident of New York. Defendants Doval, Goel, Yadav, and Gupta are citizens of India.

7. The Court has jurisdiction over the claims against the Government of India pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in the district.

## JURY DEMAND

9. Mr. Pannun demands a trial by jury.

## FACTS

**A. Parties**

10. Mr. Pannun is a human rights lawyer and Sikh political activist licensed to practice law in New York. He is a dual citizen of the United States and Canada.

11. Defendant the Government of India is a "foreign state" pursuant to 28 U.S.C. § 1603.

12. Defendant Ajit Doval is an Indian national who resides in India.

13. Defendant Samant Goel is an Indian national who resides in India.

14. Defendant Vikram Yadav is an Indian national who resides in India.

15. Defendant Nikhil Gupta is an Indian national who resides in India and is currently incarcerated in New York awaiting trial.

16. The true names and/or capacities, whether individual, or otherwise of DOES 1 through 50, inclusive, are unknown to Mr. Pannun, who has therefore sued them by their fictitious names. When their true names and/or capacities are ascertained, Mr. Pannun will seek leave to amend this Complaint by inserting their true names and/or capacities.

17. Upon information and belief, the named defendants, in their plot to assassinate Mr. Pannun, were acting at the behest of, on the orders of, and with knowledge and approval of Narendra Modi, the Prime Minister of India, who is the head of the Government and to whom Defendants Doval and Goel directly report. Mr. Pannun at this time has not named Narendra Modi as a defendant due to the immunity he now enjoys under U.S. and international law as head of a foreign sovereign government. However, Mr. Pannun reserves his right to amend the complaint to include Narendra Modi as a defendant should his status as head of state change during the course of these proceedings.

18. Defendants, including DOES 1 to 50, conspired with one another, acted in concert with one another, aided and abetted one another, were the agent, servant, and employee of one another and were operating together for a single, unified purpose.

**B. The Attempted Assassination in Context**

19. To appreciate why the regime of Prime Minister Modi ordered the assassination of a U.S. national on U.S. soil, it is important to understand the historical and political context of the relationship between India and the Sikh people, the majority of whom hail from and live in the region of Punjab, governed by India.

20. As documented by Human Rights Watch, the Modi-led Bharatiya Janta Party ("BJP") engages in systematic discrimination and stigmatization of religious minorities, including Sikhs, Muslims, and Christians, as part of its Hindu majoritarian ideology. Modi's government silences critics of the government's policies, including civil society activists and journalists. Under Modi's rule, Indian authorities regularly use politically motivated criminal charges, including charges of terrorism, to jail activists who expose government abuses.

21. The central backdrop to the assassination plot is the aspiration of many Sikhs for the establishment of a sovereign homeland— 'Khalistan'—in the Indian governed state of Punjab, which is the historical homeland of Sikhism and where Sikhs are in the majority. Sikhs in the Punjab are regularly and vigorously targeted as part of Modi's policy of repression and his excessive and brutal response to the Khalistan movement.

**1. Mr. Pannun's Advocacy for Sikh Self-Determination**

22. Mr. Pannun has long advocated for the Punjab—an area of northern India with a Sikh majority population and birthplace of Sikhism— to secede, through Referendum, from India and create an independent state called "Khalistan."

Case 1:24-cv-07072-KPF Document 147-9 Filed 10/17/24 Page 7 of 28

23. His main vehicle for promoting Khalistan is the "Khalistan Referendum" campaign (formally called "Referendum 2020"), which he leads through SFJ. This peaceful, democratic process invites the global Sikh community to vote on the question: "Should Indian Governed Punjab Be an Independent Country?" As explained by SFJ: "[T]he campaign aims to ascertain the will of the Sikhs [. . .] with regards to secession of Punjab from India and to establish an independent country. The referendum will advance the consensus among the indigenous people of Punjab on the question of sovereignty and the results of the Referendum will be presented to the United Nations seeking a UN supervised official referendum for the independence of Indian held Punjab."[2]

24. In preparation for the Khalistan Referendum campaign, SFJ engaged international lawyers to provide legal advice on the Sikhs' right to self-determination under international law, and it engaged a non-aligned panel of experts—the Punjab Referendum Commission—to oversee the balloting process to ensure fair and transparent voting and compliance with international standards of electioneering.[3] So far, SFJ has organized voting on the Khalistan Referendum in six countries spanning three continents: Australia, Canada, Italy, Switzerland, the United Kingdom, and the United States. Voting in other countries with a significant Sikh population and the Indian-governed Punjab is yet to take place.

25. Promoting the idea of secession and independence, especially through non-violent means such as referendums—whether for Scotland, Kosovo, or Khalistan— is protected political speech and not a basis for criminal prosecution.

---

[2] *See generally* Sikhs for Justice, https://sikhsforjustice.org/#1
[3] *See* Punjab Referendum Commission, https://www.punjabreferendumcommission.org/

### 2. India's Persecution of Sikhs

#### a. In India

26. The Indian Government's reactions to Mr. Pannun's separatist activities must be understood in the context of a decades-long pattern of violence against Sikhs.

27. This history of state violence against Sikhs dates to 1984, when the Indian Government unleashed "Operation Blue Star," wherein it deployed gunship helicopters, cannons, battle tanks, and over 10,000 soldiers against a small group of Sikh nationalists, who were being led by Sant Jarnail Singh Bhindranwale, and thousands of civilian pilgrims, women and children included, who were visiting Sikhism's holiest site on one of the most important religious pilgrimage days.

28. Just months later, following the assassination of Prime Minister Indira Gandhi by her Sikh bodyguards, Sikhs across India were subjected to a campaign of brutal violence, rape, and murder. Sikhs endured days of horrifying genocidal violence in their homes and their places of worship in attacks that were planned, facilitated, and coordinated by members of the then ruling Congress Party, who used local law enforcement as a means of persecution.

29. As many as 30,000 Sikhs were killed in the bloodshed.

30. Successive governments have failed to prosecute those responsible for these massacres. All attempts to prosecute government officials or police officers for their crimes against civilians have been dropped or blocked through political interference.

31. Facing a total absence of accountability, the use of violence by successive Indian governments to suppress Sikh self-determination persisted, including through thousands of extrajudicial killings of Sikhs in the Punjab.[4]

32. As Amnesty International has reported, there is a "clear pattern to the arrests, detentions, torture and 'disappearances'" of Sikh activists within the Punjab.[5]

33. In addition to the state-backed violence, the Indian authorities have misused the Indian criminal justice system to silence dissent. Many Sikhs, including Mr. Pannun, have been wrongly charged under the Unlawful Activities (Prevention) Act 1967 ("UAPA"). This controversial law punishes individuals for being a member of an 'unlawful association' or for committing unlawful activities, as defined by the Indian Government.

34. The UAPA labels a person's call "to determine whether part [of India] will remain a part of the territory of India" as an unlawful activity liable for criminal prosecution. The UAPA gives the Indian Government freedom to label any organization as 'unlawful' without judicial review.

---

[4] As described by Human Rights Watch: "[F]rom 1984 to 1995 the Indian government ordered counterinsurgency operations that led to the arbitrary detention, torture, extrajudicial execution, and enforced disappearance of thousands of Sikhs. Police abducted young Sikh men on suspicion that they were involved in the militancy, often in the presence of witnesses, yet later denied having them in custody. Most of the victims of such enforced disappearances are believed to have been killed. To hide the evidence of their crimes, security forces secretly disposed of the bodies, usually by cremating them. When the government was questioned about 'disappeared' youth in Punjab, it often claimed that they had gone abroad to Western countries." *See Protecting the Killers, A Policy of Impunity in the Punjab, India,* Human Rights Watch (Oct. 17, 2007), https://www.hrw.org/report/2007/10/17/protecting-killers/policy-impunity-punjab-india

[5] *India: Human rights violations in Punjab: use and abuse of the law,* Amnesty International (May 9, 1991), https://www.amnesty.org/en/documents/asa20/011/1991/en/

35. Unsurprisingly, Modi's government has used this unchecked authority to designate SFJ as an "unlawful organization" and has used this made-up designation to criminalize Sikh political activism.

36. Armed with this "unlawful organization" designation, Modi's government has consistently moved to label SFJ's peaceful and democratic referendums as "terrorism" and to brand its supporters as "terrorists."

37. Modi's government has even brought criminal cases in India for SFJ's activities carried out in the United States.

38. For example, in December 2020, India's National Security Adviser filed sedition and terrorism charges against Mr. Pannun and other supporters of the Khalistan Referendum because they "stag[ed] demonstrations outside Indian missions in countries like the USA, UK, Canada, Germany and so forth."

39. United Nations ("UN") experts and multiple international human rights groups have been alarmed by the Indian Government's use of the UAPA to quash political dissent. These experts and groups have questioned the UAPA's compliance with international human rights law and have noted that the law "raises serious concerns regarding the designation of individuals as 'terrorists' in the context of ongoing discrimination directed at religious and other minorities, human rights defenders, and political dissidents, against whom the law has been used."[6]

---

[6] *Comments to the Unlawful Activities Amendment Act 2019 and the 1967 Unlawful Activities Prevention Act - OL IND 7/2020*, Office of the United Nations High Commissioner for Human Rights (May 6, 2020), https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=25219.

40. For their political speech and religious beliefs, Mr. Pannun and a multitude of Sikhs have been charged with terrorism offences under the UAPA, in clear violation of basic human rights norms. Khalistan supporters have been arrested for the simplest acts of free expression, from carrying a Khalistan flag or wearing a Khalistan cap, to writing pro-Khalistan slogans on the walls of their own homes. It is estimated that several hundred supporters of the Khalistan Referendum campaign have been charged under the UAPA.

41. The Indian government has also sought to intimidate SFJ supporters by targeting their relatives who still live in India. The Government has arrested, detained, and prosecuted numerous relatives of Khalistan Referendum campaigners in Punjab.

42. As recently as March 2023, the Indian Government instituted a "Siege of Punjab," where Sikhs' homes and businesses were raided, and thousands of Sikhs were detained, arrested, and in some cases subjected to invasive searches and custodial torture for their association with the Khalistan Referendum.

43. The Government largely cut off internet access in the Punjab during its raids to isolate the Punjab from the rest of the world and so that its vicious actions could not be documented.

**b. Outside India**

44. India has not limited its attempt to silence Sikh activism to its own borders.

45. India has turned diplomatic missions in foreign countries into spy networks for its government.

46. India has sent Indian consular officials to Sikh Gurdwaras (temples) in the United States to recruit members of the community to spy on fellow Americans who support the Khalistan Referendum.

47. These consular officials have sought to intimidate members of the Sikh community by warning them that their relatives in India will face severe consequences if they support the referendum.

48. Consular officials abroad have also denied official documents (such as birth or death certificates) to supporters of the Khalistan referendum.

49. India has also attempted to use the INTERPOL Red Notice system to force many Sikh activists abroad back to India to be prosecuted.

50. A Red Notice is a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action. It is based on an arrest warrant or court order issued by the judicial authorities in the requesting country. Member countries apply their own laws in deciding whether to arrest a person.[7]

51. India has issued numerous requests to INTERPOL to arrest Khalistan supporters abroad based upon trumped-up charges under the UAPA.

52. Fortunately, INTERPOL has recognized the prospect of serious due process violations, police torture, and sham trials based on fabricated evidence and has rejected India's requests.

53. In the case of Mr. Pannun, India requested a Red Notice on May 21, 2021, alleging acts of "Terrorism related Crime" and "Terrorism Acts" under section 16 of UAPA.

54. Mr. Pannun challenged the Red Notice, and the appeal body—the Commission of the Control of INTERPOL's Files—ordered INTERPOL to delete the Red Notice. The Commission found that "[m]ost of the underlying facts of the case indicate that [Mr. Pannun]

---

[7] *See What is a Red Notice?*, Interpol, https://www.interpol.int/How-we-work/Notices/Red-Notices (last visited June 17, 2024).

has allegedly recruited young Sikhs in the Punjab region to put out flags and banners which call for the independence of Khalistan, and used social media to spread the secessionist campaign 'Referendum 2020' . . . [S]uch acts relate to one's fundamental right to freedom of speech, which is not an ordinary-law crime that falls under the definition in INTERPOL's Constitution[.]"

**C. The Government of India's Policy of Extrajudicial Murder**

55. Unable to force Mr. Pannun and other activists back to India through the INTERPOL system, India has resorted to orchestrating the murder of Sikhs in North America and other foreign countries.

56. A recent exposé by the Guardian newspaper has revealed that India has now turned to extrajudicial killings as a means of quashing dissent.[8]

57. The government agency responsible for these murders is RAW.

58. Headquartered in New Delhi, RAW's primary functions are gathering foreign intelligence, counterterrorism, counter-proliferation, advising Indian policymakers, and advancing India's foreign strategic interests. The head of RAW reports directly to Prime Minister Modi, without parliamentary oversight.

59. The Guardian's investigation, based upon intelligence documents provided by intelligence officials within both India and Pakistan, has tied RAW to more than 20 killings outside of India since 2020.

60. RAW's use of extrajudicial killing to crush dissent was apparently inspired by Saudi Arabia's 2019 murder of Washington Post journalist Jamal Khashoggi.

---

[8] *See* Hannah Ellis-Peterson, Aakash Hassan, and Shah Meer Baloch, *Indian Government Ordered Killings in Pakistan, Intelligence Officials Claim*, The Guardian (April 4, 2024), https://www.theguardian.com/world/2024/apr/04/indian-government-assassination-allegations-pakistan-intelligence-officials.

61. According to an Indian intelligence officer, senior RAW officials observed the circumstances of Khashoggi's murder and said, "if [the] Saudis can do it, why not us?"

62. The same intelligence officer explained that, from RAW's perspective, "what the Saudis did was very effective. You not only get rid of your enemy but send a chilling message, a warning to the people working against you."

63. These murders all follow a similar pattern. RAW officials pay impoverished persons or local criminals significant sums to carry out murders on the Government's behalf. The victim is typically shot at close range by a previously unknown gunman.

64. Per the Guardian's investigation, such operations "needed approval from the highest level of government." A former RAW official confirmed "[he] could not do anything without [the National Security Advisor and Prime Minister's] approval."

65. The Guardian's investigation further revealed that RAW has been targeting Sikhs advocating for self-determination for extrajudicial killings around the world. One intelligence officer told the Guardian that, following large protests in India by Sikh farmers, "places were raided and people were arrested in Punjab, but things were actually being controlled from places like Canada . . . like other intelligence agencies, we had to deal with it."

66. Two of those activists that RAW decided to "deal with" were Hardeep Singh Nijjar and Mr. Pannun.

**D. The Government of India's Murder of Hardeep Singh Nijjar**

67. Hardeep Singh Nijjar was a human rights activist and dear friend of Mr. Pannun, who helped Mr. Pannun advocate for Sikhs' rights to self-determination.

68. Like Mr. Pannun, Mr. Nijjar was a prominent member of the Khalistan movement and spearheaded Khalistan referendum campaigns in Canada.

69. On June 18, 2023, Mr. Nijjar was shot and killed in his pickup truck in the parking lot of the Guru Nanak Sikh Gurdwara in Surrey, a Sikh Temple in British Columbia where he served as President.

70. This was a carefully orchestrated assassination. A car pulled in front of Mr. Nijjar's truck, cutting him off and forcing Mr. Nijjar to brake. Just as Mr. Nijjar stopped his car, two masked gunmen approached his truck. The gunmen shot him 34 times at point blank range before fleeing to another car that was waiting to drive them away.

71. Investigation and video footage later revealed that the gunmen and getaway car had been waiting for Mr. Nijjar for over an hour prior to the shooting.

72. On September 18, 2023, on the floor of the Canadian Parliament, Prime Minister Justin Trudeau publicly announced that Canadian intelligence agencies had conducted a thorough investigation and found evidence to conclude that "agents of the Government of India" had committed the murder.

73. Mr. Trudeau stated that he had confronted Prime Minister Modi directly about this heinous crime on Canadian soil and pressured India to cooperate with Canadian authorities.

74. The Canadian government later expelled an Indian diplomat who it described as the head of India's RAW intelligence agency in Canada.

75. The Canadian government also suspended talks on a trade deal with India following this violation of its sovereignty.

76. Prime Minister Trudeau was clear that this accusation was based on strong intelligence and that "[w]e are not looking to provoke or escalate" but were "simply laying out the facts as we understand them."

77. The Indian government responded with its familiar refrain: denying accountability and trying to paint human rights activists as terrorists.

78. Rather than seek justice for Mr. Nijjar's murder, the Indian government expelled a Canadian diplomat and insisted that Canada "take prompt and effective legal action against all anti-India elements operating from their soil."

79. In May 2024, Canada arrested four individuals in conjunction with Mr. Nijjar's murder, Kamalpreet Singh, Karanpreet Singh, and Karan Brar, and charged them with first-degree murder. *See* Evan Dyer, *Police Make Arrests in Killing of B.C. Sikh Activist Hardeep Singh Nijjar*, CBC News (May 3, 2024), https://www.cbc.ca/news/politics/nijjar-killing-arrests-made-1.7192807.

**E. Defendants' Efforts to Murder Mr. Pannun**

80. At the same time the Government of India sent assassins to murder Mr. Nijjar, it also had Mr. Pannun in its sights. An Indian RAW agent (Yadav) engaged Defendant Gupta—an Indian narcotics and firearms trafficker—to do the job in exchange for ensuring that criminal charges against him in India would be dismissed.

81. Yadav wanted the murders to occur around the same time and, after India's agents killed Mr. Nijjar, he sent a video of Mr. Nijjar's bloody body to Gupta along with the address of Mr. Pannun's home in New York City and urged him to act quickly. India failed to kill Mr. Pannun only because the purported criminal associate and the assassin who Gupta hired were in fact U.S. undercover law enforcement agents. These facts were exposed on November 29, 2023, when the United States Attorney for the Southern District of New York unsealed the United States' indictment of Gupta ("U.S. Indictment"), who it charged with the attempted murder of Mr. Pannun at the direction of the Indian Government.

### 1. The Indian Government Engages Gupta to Implement the Murder of Mr. Pannun

82. According to the unsealed indictment, a Senior Field Officer, stationed within India, responsible for "Security Management" and "Intelligence" within the Indian Government apparatus directed the assassination plot against Mr. Pannun. According to the Washington Post, this officer was Yadav.

83. In May 2023, Yadav contacted Gupta and proposed a deal. If Gupta arranged the murder of Mr. Pannun, Yadav would use his position of authority to have criminal charges against Gupta in India dismissed. Gupta agreed to this proposal.

84. Yadav and Gupta communicated frequently about this plot by phone, by messaging applications, through encrypted messages, and at an in-person meeting in New Delhi, India.

85. In one of these communications, Yadav told Gupta that in addition to the "target in New York" (Mr. Pannun), he had a "target in California."

86. Gupta replied that "we will hit all our Targets."

87. In another communication, Yadav informed Gupta that his criminal case had "already been taken care of" and "nobody will ever bother you again" in exchange for his assistance in murdering Mr. Pannun.

### 2. Gupta Hires Undercover Law Enforcement Officers to Carry Out the Murder

88. Assurances in hand, Gupta pressed forward with the murder plot. At the Indian Intelligence Officer's direction, Gupta hired a person whom Gupta believed to be a criminal associate of his to organize the assassination of Mr. Pannun— "CS" in the U.S. Indictment.

89. Gupta instructed CS as to how he and Yadav wanted the assassination of Mr. Pannun to take place. For example, Gupta suggested that the hitman pretend that he was seeking Mr. Pannun's legal advice to lure him somewhere private where he could easily be killed.

90. In actuality, CS was a confidential source working for U.S. law enforcement. CS introduced Gupta to a purported hitman to carry out the murder. The purported hitman was another undercover agent for the U.S. Government— "UC" in the U.S. Indictment (CS and UC are referred to collectively as the "Undercover Agents").

91. Using Gupta as the middleman, Yadav agreed to pay the Undercover Agents $100,000 to kill Mr. Pannun.

92. Yadav and Gupta agreed to have delivered $15,000 in cash to the Undercover Agents in Manhattan as an advance for carrying out the assassination.

93. On June 9, 2023, an individual working directly with Yadav and Gupta delivered $15,000 in cash to the Undercover Agents.

94. Gupta sent text messages to Yadav confirming the payment had been made. Yadav responded approvingly.

### 3. Yadav and Defendant Gupta Set the Murder Plot in Motion

95. To set the assassination plot into motion, Yadav provided Gupta with personal information about Mr. Pannun, including his home address in New York City, his phone number, and details about his day-to-day whereabouts. Yadav instructed Gupta to provide him with regular updates on the progress of the assassination plot.

96. Gupta shared all the information and instructions provided to him by Yadav with the Undercover Agents.

97. Yadav instructed Gupta that he wanted the murder done quicky. Gupta, in turn, messaged the undercover agents to “finish him brother, finish him, don’t take too much time . . . push these guys, push these guys . . . finish the job.”

98. Gupta reported back to Yadav that he had instructed the hitmen to “discharge [Mr. Pannun] as soon as possible.”

99. Yadav also instructed Gupta, however, that the murder could not occur during the forthcoming trip to the U.S. by high-ranking Indian officials.

100. For example, on June 11, 2023, Yadav told Gupta that “[i]t looks promising . . . but we have today only . . . if it doesn’t happen today it will be done after the 24th [after the Indian officials’ diplomatic visit to the United States].”

101. Gupta conveyed this instruction to the Undercover Agents and explained that because Mr. Pannun was a well-known activist, there could be protests following his death, which could stir up “political things.”

102. Gupta also told the Undercover Agents that there would be “more jobs” once Mr. Pannun was assassinated. Gupta elaborated that their partnership would change the Undercover Agents’ lives because “we will give you more bigger job, more job every month, every month 2-3 job.”

103. While the plot unfolded, Gupta continually emphasized to the Undercover Agents that Yadav was closely monitoring the plot’s progress. On one occasion, Gupta forwarded a “message from our friends” from Yadav to the Undercover Agents stating to “follow [Mr. Pannun] till the time he enters his house or any other final place.”

### 4. Defendants' Efforts to Coordinate Murdering Mr. Pannun with Their Plot to Kill Mr. Nijjar

104. On June 12, 2023, Gupta informed the Undercover Agents that there was a "big target" in Canada. Two days later, Gupta messaged the Undercover Agents that "we will be needing one good team in Canada also, [t]omorrow I will share you the details."

105. On June 16, 2023, Gupta told the Undercover Agents "we are doing their job, brother. We are doing their New York [and] Canada [job]."

106. On June 18, 2023, Mr. Nijjar was assassinated, apparently on the orders of Indian Government officials.

107. Later that same evening, Yadav sent Gupta a video clip of Nijjar's bloody body slumped in his truck. One hour later, Yadav sent Gupta the address of Mr. Pannun's home in New York City, as a message to move forward with the murder.

108. Gupta forwarded the video clip of Nijjar's bloody body to the Undercover Agents and confirmed that the murder of Mr. Nijjar was the previously mentioned "job" in Canada.

109. Gupta further instructed the Undercover Agents that they should no longer wait until after the diplomatic visit to carry out the murder. He told the Undercover Agents to carry out the murder as soon as they could and that they should "go anytime, even today, tomorrow-as early as possible." Gupta also warned the Undercover Agents that Mr. Pannun may be more careful in light of Mr. Nijjar's murder, stating: "He will be more cautious, because in Canada his colleague is down. His colleague is down. I sent you the video."

110. Gupta further instructed the Undercover Agents that if Mr. Pannun is "not alone" they should "put everyone down."

111. On June 20, 2023, Yadav sent Gupta a news article about Mr. Pannun and his advocacy with the message "it's a priority now."

112. Gupta then called the Undercover Agents and instructed them to "find the opportunity" and "do it quickly" adding that they had "four jobs" to complete by June 29th—the murder of Mr. Pannun and "three in Canada."

### *5.* The United States Foils India's Plot to Murder Mr. Pannun

113. Following Mr. Nijjar's murder, Yadav consistently pressured Gupta to make sure the murder could move forward as quickly as possible.

114. These messages from Yadav included information about Mr. Pannun's whereabouts.

115. On June 24, 2023, Yadav sent a message to Gupta that he needed to know the location of the hitmen because "now it is a clear go ahead." The Undercover Agents sent pictures to Gupta showing they were in the vicinity of Mr. Pannun's home.

116. Upon receiving the pictures from Gupta, Yadav replied, "[e]xcellent . . . [t]hey are proving that they are quite serious now" and "the coming 24 hours will be crucial" because Mr. Pannun "will definitely come to either home or office." Yadav instructed Gupta that the hitmen should be "ready for both locations."

117. Gupta passed the message along to the Undercover Agents that they should "keep eyes at this house, his office and the café he used to visit."

118. On June 29, 2023, Gupta messaged the Undercover Agents that "we have Intel that the [Victim] . . . has arrived back to his home" and "[t]oday he should come out definitely." He added that the Agents should "[t]ry to get this done if you have visuals and if you are sure."

119. On June 30, 2023, Gupta traveled from India to the Czech Republic.

120. Gupta was immediately arrested upon his arrival in the Czech Republic and, on June 14, 2024, was extradited to the U.S. to be prosecuted for his attempted murder of Mr.

Pannun. *See United States of America v. Gupta*, No. 1:23-CR-00289-VM (S.D.N.Y. filed June 13, 2023).

**F. The Government of India's Fake Investigation**

121. As India's plot to assassinate Mr. Pannun was unfolding in June 2023, Prime Minister Modi met with President Biden at the White House as part of an ongoing effort to enhance India's international standing and strengthen its strategic partnership with the United States.

122. In November 2023, the U.S. Attorney's Office for the Southern District of New York unsealed its Superseding Indictment against Gupta, alleging a conspiracy with an Indian Intelligence Officer (later determined to be Yadav) at RAW.

123. Under mounting pressure from the U.S., the Government of India sought to distance itself from the Indictment's allegations. On November 18, 2023, it allegedly formed a "high-level Enquiry Committee" to investigate the allegations regarding the plot against Mr. Pannun.

124. In March 2024, Indian officials leaked the alleged results of that "investigation," which are not yet public. They claimed that the government-appointed investigators cleared the Government of any wrongdoing and instead found that a "rogue operative" from RAW had been responsible.

125. The so-called "investigation" was clearly a sham, however. The so-called rogue operative (apparently, Yadav) did not work alone. As the U.S. Indictment makes clear, "Gupta, CC1 [Yadav] <u>and others</u> worked together to carry out a plot directed from India . . . " (emphasis added). Specifically, Yadav assured Gupta that he had "spoken with the boss about your Gujarat case" and that "nobody will ever bother you again" and offered a meeting with the Deputy Commissioner of Police; he told Gupta that "we are ready to pay $150,000" for the murder; he

arranged with a colleague in New York (who had an Indian phone number) to deliver $15,000 to the Undercover Agents; he instructed Gupta not to carry out the assassination during meetings between high level U.S. and Indian officials; and he had detailed information on the murder of Nijjar in Canada.

126. Likewise, when opposing extradition from the Czech Republic to the United States, Gupta argued (unsuccessfully) that he could not be extradited because he was acting on an assignment given to him by the Indian Government.[9]

127. The recent Washington Post reporting has confirmed that Yadav oversaw the conspiracy with approval from Goel, the RAW chief at the time. It also noted that U.S. intelligence agencies have assessed that Defendant Doval, Modi's national security adviser, was "probably aware of RAW's plans to kill Sikhs his government considered terrorists."

128. Upon information and belief, Defendants Gupta and Yadav were acting at the behest of, on the orders of, and with the approval of Defendant Doval.

129. Upon information and belief, all named Defendants, were acting at the behest of, on the orders of, and with knowledge and approval of Narendra Modi, the Prime Minister of India, who is the head of the Government and to whom the Defendants Doval and Goel directly report.

130. As of September 2024, the Government of India had not begun a criminal action against Yadav or even taken him off its payroll.

[9] *See Constitutional Court Dismissed Complaint of Detained Foreign National to Be Extradited to the USA For Criminal Prosecution*, The Constitutional Court of the Czech Republic (May 24, 2023), https://www.usoud.cz/en/current-affairs/constitutional-court-dismissed-complaint-of-detained-foreign-national-to-be-extradited-to-the-usa-for-criminal-prosecution.

131. The scheme to kill Mr. Pannun bears all the hallmarks of the many other extrajudicial killings that Prime Minister Modi and RAW have orchestrated, as detailed below. It is part of India's policy of trying to silence political dissenters, wherever they may reside.

**G. The Government of India's Ongoing Persecution of Sikhs**

132. The Government of India's unrelenting persecution of Sikhs and sham investigation has caused Mr. Pannun to remain fearful that, even after Gupta's arrest, India's plot to assassinate him continues.

133. The Government of India goes to extreme lengths to quash dissent. In March 2023, as part of a no-holds-barred manhunt for Amritpal Singh—another Sikh activist—the Government deployed thousands of paramilitary soldiers, arrested 200 people, blocked Twitter accounts in India for journalists and Sikh figures abroad, and shut down all internet and SMS services for 27 million Indian residents.

134. Other Sikh activists and Khalistan supporters have been captured, imprisoned, and tortured in recent years. Tens, possibly hundreds, of Sikhs have been arrested simply for supporting the Khalistan Referendum, such as by putting up posters in public places, wearing Referendum T-shirts, or sharing social media posts. For example, on December 30, 2021, police detained 50-year-old Mrs. Jasvir Kaur and her son, Ravinder Singh, for sharing posts on social media in support of the referendum. Mrs. Kaur was detained in prison for eight months.

135. The Government of India has deployed RAW internationally, too. Australia expelled two RAW officers in 2020 after they were caught monitoring India's diaspora community, trying to penetrate local police departments, and stealing information about security systems at airports. In Germany, RAW agents were running a website that purportedly covered local Sikh events.

136. The Government of India’s playbook also includes extraterritorial murder. Following recent reporting, noted above, that India has killed 20 international targets since 2020, India’s defense minister said expressly that India will kill targets outside its borders where it deems necessary.

137. According to U.S. and Indian officials, RAW, under Modi, is now “wielded as a weapon against dissidents in India’s vast global diaspora.”

138. Indeed, Modi himself said in April 2024 that his “New India” will “come[] into your home to kill you.” He repeated the claim to the Indian Parliament on July 2, 2024.

139. Modi’s Defense Minister, Rajnath Singh, recently reiterated India’s willingness to go find people who “escape” to other countries and “kill them there.”

140. In Britain, RAW is suspected by some to have been involved in the death of Sikh activist Avtar Singh Khanda, who died in Birmingham three days before Nijjar was killed in Canada.

141. On information and belief, the FBI has issued warnings to dozens of Sikhs in the United States that their lives might be in danger.

142. In August 2024, Royal Canadian Mounted Police (RCMP) and Ontario Provincial Police (OPP) warned Brampton, Ontario based Canadian Sikh activist Inderjeet Singh Gosal of a serious threat to his life. Mr. Gosal took over the task of organizing Khalistan Referendum voting in Canada after Nijjar’s assassination and is a close associate of Plaintiff Pannun. In February 2024, Gosal’s house was targeted in a drive-by shooting. The shooting was instantly and widely celebrated and cheered on social media by Pro Hindutva-BJP accounts as a step further in implementing Modi's declared policy of "Ghar Main Ghus Ke Maren Ge" (We will enter your home and kill you).

143. Alarmed by the Government of India's increased transnational targeting of religious minorities and those advocating on their behalf, in December 2023, the United States Commission on International Religious Freedom implored the U.S. Department of State to designate India a Country of Particular Concern (CPC).

144. The Government of India has given no indication that it will stop its mercenary approach to political dissent, even after U.S. authorities uncovered the plot against Pannun.

## CAUSES OF ACTION

### First Cause of Action
### Assault

145. Mr. Pannun hereby incorporates by reference each and every allegation contained in this complaint as though fully set forth herein.

146. As alleged above, Defendants have intentionally caused Mr. Pannun to become concerned that Defendants or their cohorts are about to cause a harmful or offensive bodily contact to Mr. Pannun.

147. As a result of Defendants' conduct, Mr. Pannun has suffered damages in an amount to be proven at trial.

### Second Cause of Action
### Intentional Infliction of Emotional Distress

148. Mr. Pannun hereby incorporates by reference each and every allegation contained in this complaint as though fully set forth herein.

149. As alleged above, Defendants intentionally tried and are trying to cause Mr. Pannun extreme emotional distress.

150. Defendants conducted themselves in a manner so shocking and outrageous that it exceeds all reasonable bounds of decency.

151. As a direct result of Defendants' conduct, Mr. Pannun has suffered severe emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court issue the following relief:

A. Declaratory relief.

B. Preliminary and permanent injunctive relief.

C. Damages in an amount to be determined at trial.

D. Plaintiff's attorney's fees and costs.

E. Punitive damages as allowed under law.

F. All such other and further relief as the Court may deem just, proper, and equitable.

Dated: September 17, 2024

Respectfully Submitted,

*/s/ J. Noah Hagey*

J. Noah Hagey
Molly M. Jamison
Amelia Courtney Hritz
**BRAUNHAGEY & BORDEN LLP**
118 W 22nd Street, 12th Floor
New York, NY 10011
Tel.: (646) 829-9403
Fax: (646) 403-4089
hagey@braunhagey.com
jamison@braunhagey.com
hritz@braunhagey.com

Matthew Borden
Kory J. Declark
**BRAUNHAGEY & BORDEN LLP**
747 Front Street, 4th Floor
San Francisco, CA 94104

Tel.: (415) 599-0210
Fax: (415) 276-1808
borden@braunhagey.com
declark@braunhagey.com

Richard J. Rogers
**Global Diligence LLP**
30-31 Furnival Street, 5th Floor
London, EC4A 1JQ
United Kingdom.
richardrogers@globaldiligence.com

*Attorneys for Plaintiff Gurpatwant Singh Pannun*